## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CYNTHIA WAKLATSI | ) | CASE NO. |
| 3141 Werk Rd., Apt. 9 | ) | |
| Cincinnati, OH 45211 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SISTERS OF CHARITY OF CINCINNATI, | ) | |
| OHIO | ) | |
| d/b/a BAYLEY PLACE | ) | |
| 990 Bayley Drive | ) | **COMPLAINT FOR DAMAGES** |
| Cincinnati, Ohio 45233 | ) | **AND INJUNCTIVE RELIEF** |
| | ) | |
| **Serve Also:** | ) | **JURY DEMAND ENDORSED** |
| Sisters of Charity of Cincinnati, Ohio | ) | **HEREIN** |
| d/b/a Bayley Place | ) | |
| c/o Teres Dutcher, SC (Stat. Agent) | ) | |
| 5900 Delhi Road | ) | |
| Mount St. Joseph, OH 45051 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff CYNTHIA WAKLATSI by and through undersigned counsel, as her Complaint against the Defendant, states and avers the following:

### PARTIES

1. Plaintiff Cynthia Waklatsi ("Waklatsi" or "Plaintiff") is a resident of the city of Cincinnati, Hamilton County, state of Ohio.

2. Defendant SISTERS OF CHARITY OF CINCINNATI, OHIO d/b/a BAYLEY PLACE ("Bayley") is an Ohio-incorporated non-profit that conducts business within the state. The relevant location of the events and omissions of this Complaint took place was 990 Bayley Drive, Cincinnati, Ohio 45233.

3. Bayley is, and was at all times hereinafter mentioned, Waklatsi's employer within the meaning of Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 et seq. and R.C. § 4112.01(A)(2).

## JURISDICTION & VENUE

4. All of the material events alleged in this Complaint occurred in Hamilton County, Ohio.

5. Therefore, personal jurisdiction is proper over Defendant pursuant to Ohio Revised Code §2307.382(A)(1), (3) and/or (4).

6. Venue is proper pursuant to Civ. R. 3(B)(1), (2), (3), (5), and/or (6).

7. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

8. Waklatsi is a former employee of Bayley.

9. At all times noted herein, Waklatsi was qualified for her position with Bayley.

10. At all times noted herein, Waklatsi could fully perform the essential functions of her job, with or without a reasonable accommodation.

11. Waklatsi is African American, placing her in a protected class for her race.

12. Waklatsi worked for Bayley Place as a Certified Nursing Assistant ("CNA") from February 5, 2019, until Bayley terminated Waklatsi's employment on or about March 11, 2020 citing job abandonment.

13. There is a bit of confusion about Waklatsi's official termination date, but the 11th was her final day of work and the date Bayley cited when contesting her Unemployment Benefits.

14. Waklatsi initially came to work for Bayley after an interview with Jenny Lee (HR hiring manager, Caucasian).

15. Shortly after her positive interview, Waklatsi was offered the job, completed her drug screen, and began on nightshift.

16. Waklatsi started to have issues with some of her coworkers early on in her employment. Many of the longer-tenured employees were not welcoming of the new hires.

17. Bayley has a policy of nurse/assistant rotations between the various units throughout the site.

18. The Hillside Unit is well-known as the most difficult unit at Bayley, and the new hires typically worked there substantially more often than is allowed by that policy. This was because of the longer-tenured employees who control the schedule, upon information and belief.

19. In particular, Crystal Walters (State Tested Nursing Assistant ("STNA"), Caucasian) and Rhonda Morell (STNA, Caucasian) were overly demeaning to new hires (including Waklatsi) and consistently switched out of their placements on the Hillside Unit.

20. Throughout this time, this unfairness caused roughly five dozen staffers to resign.

21. Additionally, the new African American staff were substantially more likely to resign than the new Caucasian staff.

22. This pattern came not only because of what seemed to be racially-based placement for the schedules, but also because of disparately negative and condescending treatment from leadership to the African American employees.

23. After some time, Waklatsi grew tired of the disparate treatment and requested that Bayley follow its prescribed process for evenly distributing placements. Unfortunately, this issue was never remedied.

24. In or around December 2019, Waklatsi applied for a day shift opening to move out of the night shift.

25. Shortly beforehand, she had also gotten into an argument with Charmaine Smith (registered nurse ("RN"), African American) while at the Hillside Unit.

26. During her overnight shift, one of Waklatsi's residents in the unit refused to go to sleep after she put the patient to bed.

27. This was a recurring issue with this resident, the resident often stayed up later and/or got out of bed after being put in. This resident was also a known fall risk.

28. As Waklatsi put the resident to bed, the resident did not have a nightgown to wear.

29. Waklatsi offered the resident a hospital gown instead, but the resident refused and instead wore the clothes the resident wore through the day. The resident then went to bed.

30. A few hours later, the resident got back out of bed again and walked to the nurse's station. This occurred a few times that evening.

31. Smith then had Waklatsi make the resident a sandwich and put the resident back to bed.

32. Later, the resident got up once more and wandered back to the nurse's station. Smith yelled at Waklatsi to take the resident to bed again, which she did.

33. Once more, the resident got up and returned to the nurse's station. This final time, Smith put the resident into a wheelchair and told Waklatsi to change the resident because the resident stank.

34. Waklatsi could not smell any mess on the resident and had just taken the resident to the restroom, so she pushed back on the directive from Smith.

35. Smith told Waklatsi to do so anyway, but Waklatsi stated the resident was refusing to be changed in the first place and that the residents always had the right to refuse those actions.

36. Smith told Waklatsi to take the resident back again and that the resident was Waklatsi's to deal with.

37. Waklatsi denied this, reiterating that the resident was a resident by choice, and thus had the ability to refuse service.

38. Not wanting to outright refuse a directive from her superior, Waklatsi took the resident once more to bed anyway, then filed a formal complaint against Smith with Monica Forsden (scheduler, Caucasian).

39. Waklatsi then requested the transfer to day shift and spoke with Karen Rowland (director of nursing ("DoN"), Caucasian).

40. On or about January 6, 2020, Waklatsi had her final overnight shift.

41. At the end of the shift, Waklatsi called Barbara Taylor (day-shift nurse, Caucasian) to ask who would be relieving her at the end of her shift.

42. Taylor was nasty in the call but told Waklatsi that she would get someone to relieve Waklatsi as soon as she could.

43. Waklatsi noted that her shift ended soon and that she would leave when it was done, then Taylor hung up on her.

44. During Waklatsi's first day shift on or about the 7th, she received written disciplined for hanging up on Taylor, despite that accusation being outright false and that Taylor was the one who hung up on Waklatsi.

45. Waklatsi later spoke with Carolyn Tepe (assistant DoN, Caucasian) about the events with Taylor.

46. Waklatsi recounted the events, then Tepe told her to be careful with her call-offs from work as she had a few attendance points accrue.

5

47. Waklatsi said she got sick often, but Tepe didn't care, saying only to be more careful.

48. Through January 2020, Waklatsi unfortunately was called a racial slur twice by a resident. This resident then passed away by the end of the month.

49. Bayley was running short-staffed throughout this time as well with Waklatsi often working alone on her shift, despite policy having two or more CNAs on each floor at a time. This resulted in numerous employee complaints.

50. Additionally, Bayley was having meetings about hiring another full-time staffer to help alleviate the issue.

51. This was a position that needed to be refilled often as when Bayley hired African American staffers to fill it, the Caucasian nurses would file complaints about the new hire until they were removed.

52. From January to February 2020, Waklatsi complained that Bayley was not adequately filling positions and that it seemed to be race-related. This was another protected complaint of discrimination.

53. Still, Waklatsi offered to remain in the shift until the company hired a new person to fill it.

54. Susan Goldrainer (nurse, Caucasian), a previous problem for Waklatsi, continued her busybody gossiping about Waklatsi and the other employees, and Waklatsi complained to her superiors about Goldrainer's gossiping.

55. In or around February 2020, Waklatsi had the final straw with Goldrainer's gossiping. She and Waklatsi were working together with a dementia patient.

56. Notably, this resident was the strongest on the floor, but the dementia worsened to the point where the resident now had trouble walking and standing.

6

57. Tepe drafted up a new care plan for the resident with Waklatsi's help, which mostly focused on the transitions between meals and the resident's favorite chair.

58. The resident's arm hurt because of the frequent transitions and that the nurses had to physically help the resident get up to perform them.

59. The resident's spouse asked the nurses to mostly only move the resident for meals, but to otherwise leave the resident in the chair because of the arm pain.

60. That day in February, however, Goldrainer told Waklatsi to ignore the new plan and to keep the resident in a wheelchair at almost all times.

61. Waklatsi pushed back noting the plan and the spouse's directives and that the nurse writing the care plans were not the ones actually performing the work.

62. Later, Tepe presented a write-up from Goldrainer against Waklatsi. She refused to sign it.

63. Waklatsi was disciplined for following the patient's care plan, rather than the specific directive from her superior that did not want to follow it.

64. Waklatsi then reported Goldrainer for this and requested to not work with her again. Waklatsi was then removed from the shift.

65. Yet again, Bayley could not keep an African American in the position because of false and illegitimate complaints from Caucasian nurses.

66. Going forward, Waklatsi worked in a floater position. Because of continued, repeated, and false complaints from her Caucasian coworkers, Waklatsi was brought into the office and falsely accused of intimidating her fellow nurses.

67. By that point, Waklatsi knew her days were numbered, so she requested to go PRN to limit the accusations against her. This was denied, but she was allowed to begin working part-time instead.

7

68. On or about March 11, 2020, Waklatsi had her final day of work. This was a regular shift on the 1st floor Orchards Unit and there were no serious issues that day.

69. Waklatsi spoke again with Tepe about her floater status, she was generally happy with it as she wanted experience in all of the various units throughout the campus.

70. Waklatsi's next scheduled shift was March 14, 2020. The COVID-19 pandemic began in full force around this time.

71. On or about March 13, 2020, Waklatsi called Erin (LNU, day shift nurse, Caucasian) and mentioned she had to take the 14th off because of her child's illness. Waklatsi was sick as well.

72. Waklatsi stated she was unsure whether she had COVID-19 or something else, so she did not want to endanger the residents and her coworkers with potential infection, so called off work for her next shifts through the 19th. She repeated the call-offs to Greg (LNU, supervisor, Caucasian).

73. The following Monday, Waklatsi called Forsden to talk further about her quarantine as instructed by Greg (LNU).

74. Forsden asked Waklatsi if she planned to return. Waklatsi did, but noted she was taking the two-week quarantine as required by the Centers for Disease Control and Prevention, so would return at the end of the two-week period.

75. Unfortunately, on or about April 2, 2020, Waklatsi had not yet recovered from her illness. She called into Bayley and spoke again with Forsden.

76. Waklatsi told Forsden that she was not yet recovered, so would have to be out longer than expected.

8

77. On or about April 7, 2020, Waklatsi called Forsden again to give an update on her expected return to work.

78. Unfortunately, by that time, Waklatsi had been formally locked out of Bayley's internal systems.

79. Waklatsi called a few more times and left messages each time, but never received any response from Bayley. Waklatsi then had to assume she was fired.

80. Throughout her employment with Bayley, Waklatsi was consistently treated as lesser in comparison to her Caucasian counterparts.

81. Bayley, even further, has a pattern history of firing African American employees and replacing them with Caucasians. This evidences a pattern of discriminatory conduct by the company.

82. Bayley perceived Waklatsi as disabled due to her call-offs for illness at the end of March 2020.

83. Alternatively, Waklatsi was disabled due to her illness in March 2020.

84. Rather than working with Waklatsi to get her back to work in a reasonably safe manner, the company simply removed her from the scheduler and system without notice.

85. Waklatsi became FMLA eligible in or around early February 2020. She then took substantial time off due to illness in March.

86. Based on the amount of time off work, Bayley had reasonable notice that Waklatsi had a serious health condition which would trigger the company's affirmative duty to provide information about it.

87. Bayley, however, did not provide this information. By failing to do so, Bayley interfered with Waklatsi's FMLA rights.

88. Defendant's purported reason(s) for Waklatsi's termination was pretextual.

89. Defendant actually terminated Waklatsi's employment discriminatorily against her race, disabilities, in retaliation against her protected complaints, in a preventative effort against her FMLA, and/or to avoid complying with Ohio public policy regarding sick leave for potential COVID-19.

90. As a result of the above, Waklatsi has suffered damages.

## COUNT I: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq*.

91. Waklatsi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

92. Waklatsi is African American, and thus is in a protected class for her race.

93. R.C. § 4112 *et seq*. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

94. Defendant treated Waklatsi differently than other similarly situated employees based upon her race.

95. Defendant's termination of Waklatsi was an adverse employment action against her.

96. Defendant's purported reason(s) for Waklatsi's termination was pretextual.

97. Defendant actually terminated Waklatsi's employment due to her race.

98. Defendant violated R.C. § 4112 *et seq*. by terminating Waklatsi because of her race.

99. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Waklatsi differently from other similarly situated employees outside her protected class.

100.      Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Waklatsi's race.

101.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Waklatsi's race.

102.     Waklatsi incurred emotional distress damages as a result of Defendant's conduct described herein.

103.     As a direct and proximate result of Defendant's acts and omissions, Waklatsi has suffered and will continue to suffer damages.

## COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, *et seq.*

104.     Waklatsi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

105.     Waklatsi is in a protected class for her disabilities (described *supra*).

106.     Alternatively, Bayley perceived Waklatsi as disabled, placing her in the protected class for disability.

107.     R.C. § 4112 *et seq.* provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disabilities.

108.     Defendant treated Waklatsi differently than other similarly situated employees based upon her disability.

109.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Waklatsi differently from other similarly situated employees outside her protected class.

110.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Waklatsi's disability.

111.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Waklatsi's disability.

112.     Waklatsi incurred emotional distress damages as a result of Defendant's conduct described herein.

113.     As a direct and proximate result of Defendant's acts and omissions, Waklatsi has suffered and will continue to suffer damages.

### COUNT III: RETALIATION

114.     Waklatsi restates each and every prior paragraph of this complaint, as if it were fully restated herein.

115.     As a result of the Defendant's discriminatory conduct described above, Waklatsi complained of the discrimination, harassment, and disparate treatment she was experiencing.

116.     Subsequent to Waklatsi's complaints to management about harassment, bullying, and disparate treatment toward her, Defendant took adverse employment actions against Waklatsi, including, but not limited to, terminating her employment.

117.     Defendant's actions were retaliatory in nature based on Waklatsi's opposition to the unlawful discriminatory conduct.

118.     Pursuant to R.C. § 4112 *et seq.*, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

119.     As a direct and proximate result of Defendant's retaliatory discrimination against and discharge of Waklatsi, she has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT IV:  UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

120. Waklatsi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

121. Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

122. Bayley is a covered employer under the FMLA.

123. Waklatsi was an employee eligible for FMLA due to her serious health conditions (described *supra*).

124. During her employment, Waklatsi qualified for FMLA leave due to her disabilities because she was terminated.

125. During her employment with Bayley, Waklatsi was unable to receive FMLA benefits for her disabilities as the company failed to provide her information.

126. Defendant unlawfully interfered with Waklatsi's exercise of her rights under the FMLA in violation of § 105 of the FMLA and § 825.220 of the FMLA regulations.

127. Defendant's refusal to provide Waklatsi with information pertaining to FMLA leave and/or permit Waklatsi to take FMLA leave violated and interfered with her FMLA rights.

128. As a direct and proximate result of Defendant's conduct, Waklatsi suffered and will continue to suffer damages.

129. As a direct and proximate result of Defendant's conduct, Waklatsi is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorneys' fees.

13

## COUNT V: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

130.    Waklatsi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

131.    A clear public policy exists and is manifested in Ohio and federal statutes, including Governor DeWine's Stay-At-Home Order, the Family First Coronavirus Response Act ("FFCRA"), R.C. § 4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on complaints of unsafe working conditions caused by the COVID-19 pandemic and/or other causes.

132.    Waklatsi repeatedly made reports to Defendant about the unethical, unlawful, and/or policy-violating behavior that was going on there, including, but not limited to, unsafe working conditions caused by unsafe working conditions related to the coronavirus pandemic and other things.

133.    Defendant's termination of Waklatsi's employment jeopardizes these public policies by undermining the authority of Gubernatorial orders, federal relief policies, and state statutes.

134.    Defendant's termination of Waklatsi's employment was motivated by Waklatsi's conduct related to these public policies because of the risk to her and to the public's health.

135.    Defendant's purported reason for Waklatsi's termination was pretextual.

136.    Defendant actually terminated Waklatsi's employment to prevent an FFCRA claim.

137.    Defendant's termination of Waklatsi jeopardizes these public policies.

138.    Defendant's termination of Waklatsi was motivated by conduct related to these public policies.

139.    Defendant had no overriding business justification for terminating Waklatsi.

14

140.     Alternatively, Defendant's overriding justification was pretext.

141.     As a direct and proximate result of Defendant's conduct, Waklatsi has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Waklatsi demands from Defendant the following:

a) Issue a permanent injunction:

    i.   Requiring Defendant to abolish discrimination, harassment, and retaliation;

    ii.  Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.  Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.   Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Waklatsi for physical injury, physical sickness, lost wages, emotional

15

distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d)   An award of punitive damages against each Defendant in an amount in excess of $25,000;

e)   An award of reasonable attorneys' fees and non-taxable costs for Waklatsi's claims as allowable under law;

f)   An award of the taxable costs of this action; and

g)   An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

   /s/ Matthew Bruce
Matthew G. Bruce (0083769)
         Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
8354 Princeton-Glendale Rd., Ste. 203,
West Chester, Ohio 45069
Phone: (216) 291-4744 x173
Fax:    (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com

*Attorneys for Plaintiff Cynthia Waklatsi*

16

**JURY DEMAND**

Plaintiff Cynthia Waklatsi demands a trial by jury by the maximum number of jurors permitted.


    /s/ Matthew Bruce    
Matthew G. Bruce (0083769)